Good morning. May it please the Court, William Harris, on behalf of Clifford Dodd. Would you please speak up so we all may hear you? Yes. Thank you, Your Honor. The question is whether or not there was – this was a legal traffic stop on April 17 of my client's vehicle. In the district court, the government proffered two bases for the traffic stop. First being an equipment violation. And the district court made the determination there was no reasonable suspicion of an equipment violation. And that doesn't seem to be challenged on appeal. So the question boils down to whether there was reasonable suspicion based on the wiretap intercepts. And I believe that there was not reasonable suspicion from those wiretap intercepts because there was a mistake of law as to the sufficiency of those wiretap intercepts to support the stop. Now, we attribute all the knowledge of all the officers to the officer who made the stop. Correct. Even though he was not aware of the information. Under United States v. Hensley and the collective knowledge doctrine, that's correct. So you take the – Must the officer subjectively believe that he – that somebody in the department or somebody within the law enforcement agency – I guess this was the police department. L.A. Sheriff's Department. Sheriff's Department. Sheriff's Department. That somebody within the organization has what amounts of power or cause. Is there any requirement like that? There has to be as well. Some of this was clarified in the Miguel case that was just decided on May 27 by this court. And it seems to be that the officer has to have – it's got to be objectively reasonable on the face. If there's – if it's obvious to the officer that the information is baloney and it couldn't possibly be probable cause, then I suppose there – but I think it's a fairly low threshold. I think in this case, he was – the officer that made the stop was given some orders to try to find some reasonable basis based on a traffic violation. But the other – And he blows it. He – Right. He makes a bogus stop. So it really comes down to whether or not these wiretap intercepts provided the reasonable suspicion. And I would suggest to the court that it – where the focus should be and where it really – where this case really hinges is on Exhibit P, which is pages 259 to 262 of the excerpts. It's an April 16 conversation between Green and Williams. And the problem here is that there was a mistake of law as to the interpretation of that four-page transcript. And what I suggest to the court is what that transcript really says. There's several points. What they took out of it is – What page is that? This is pages 259 to 262 of the excerpts, Exhibit P. It's an April 16 conversation between Green and Williams. And the reason I think that the case hinges on that four-page transcript is because what the district court and what the officers, the DEA, took out of that is that Dodd, my client, would be transporting methamphetamine to his employer's office the next morning. Let me just ask you a question that is wholly apart from the traffic stop. The declaration details a lot of things other than the April 16 call that deals potentially with this transportation issue. And my question is this. If we leave out the transportation piece, it would appear that there is plenty of cause to believe that in the house that ultimately was also searched, that there was plenty to support the warrant without the traffic stop. And if that's true, what difference does it make whether the stop was a good stop or not a good stop? The warrant – accepting that premise, if you take out the dope from the traffic stop, then yes, I would agree. But I don't think that under any reasonable reading of the warrant you could get that because the warrant presented to this Judge Estes – The warrant or the affidavit? I'm sorry. Excuse me. The affidavit in support of the warrant. The traffic stop was front and center. There was – a lot of this other stuff wasn't mentioned in the affidavit presented to Judge Estes. They said we just pulled over this guy and we found methamphetamine in the truck and we want – it's his house. We want a warrant to search that house. So if you take out the traffic stop and the methamphetamine found in his truck, there's not much left when you look at that warrant. So they knew that Williams' store was not necessarily a drug-free environment, did they not? And that also Dodd had previously participated in the conspiracy and was quite likely that methamphetamine at his house that he was making it the night before. In fact, the district court said the record unequivocally establishes that he had been selling small amounts that American performance cycle. No. See, the record does not – see, that's incorrect because they're going on this trap, Exhibit B, which is pages 221 to 223 of the excerpts in which, if you read that, what – this is Bob Williams talking. He says that Dodd had been receiving calls at the office, not making transactions at the office, that Susan had been placing phone calls to Dodd at the office. And Dodd's got to stop that because somebody might pick up some names and – Over little things, which the – Placing orders. The inference – Placing orders for small amounts of methamphetamine that Dodd dealt off premises. So I don't – I don't think that you can get that from Exhibit B, that he was selling at the premises. And the court basically said – Judge Fease basically said he was accepting that for purposes of argument, saying, you know, even if he never did anything on the premises, he'd still lose because. Well, I don't think he does because that same Exhibit B, he made a specific point, Williams, to his employee Dodd, that protect my investment, keep this away from the premises. And all the MO had been for Dodd to make the eight-ounce small sales at his house. So the – what I take out of – getting back to this Exhibit P that I think the case hinges on, there's a couple of things when you read that. Here's – here's what it says. First of all, Williams says that they salvaged 850 – 850 grams, milligrams, I don't know, of the 1,200 out of the explosion, that there would be more – Williams says that he would provide more precursor chemicals to Green in the morning. See, Green had the connection to this cook who was cooking up the methamphetamine, that they would provide more precursor chemicals – precursor chemicals to the cook in the morning, that Williams needed – nevertheless needed some finished methamphetamine from Green so that he could make another eight-ounce sale. And finally, that they would give the – that Green, who had the connection to this cook, should give the 850 grams or whatever that was salvaged, store it with Dodd. So the – I think zeroing in, the problem was that they misinterpreted this statement about Williams. What was going to happen tomorrow is Williams was going to provide – Williams – see, Williams had the precursor chemicals and he provided it to the cook. Why actually do we need to parse these things? The – maybe he uses a more plausible reading of what is – this ambiguous and conversations that are obviously designed to veil what's going on. Can't police officers look at it and draw – if that is a reasonable inference, if not necessarily the most reasonable inference from the conversation, isn't that enough? I don't think – well, if it's a reasonable inference, I think it's just a plain misreading. We interpret language all the time. You know, we – statutes, contracts, all sorts of things. You know language can sometimes be read in different ways by reasonable people. And it just strikes me that maybe you have a good argument that, you know, parsing these things, your reading is better. I think you'd have to persuade us that the police's reading is just way out there, so implausible that no reasonable officer, no reasonable person would entertain it. Well, you read it and you know that Williams had the precursor chemicals and Green had the connection to the cook. And just the plain reading of it, the way I read it, it says I'm going to provide – there was this explosion a couple days ago. Most of it was gone. They saved 850. Williams needs some more of the finished product. I'm going to give you some more precursor chemicals. He'd been getting that off of the – from the other connection out in Riverside. It's – I'm arguing more of a plain reading of it. So I have to show – You're a strict constructionist, I gather. I'm trying to be. And so I think I have to show – You have minus one minute left. Yes. So if you want to save any of the time for rebuttal. Okay. I'll save my minus one minute. Thank you, Your Honor. May it please the Court. Good morning, Your Honor. I'm Robert Dugdale and I represent the United States in this matter. In his brief, the defendant concedes, as he has to, that in determining whether there is reasonable suspicion to make the stop in this case, law enforcement can rely on the collective knowledge of all the investigating officers, regardless of whether that information – What case was that? That's United States v. Sutton, Your Honor. Hensley was actually a probable cause case. But United States v. Sutton says, and I quote, When you look to reasonable suspicion, you look to all of the officers involved in the criminal investigation, although all the information known to law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop. But counsel, this case, unlike Sutton, we don't have any pattern or practice. The surveillance really revealed nothing in this case, as opposed to the surveillance in Sutton. And the telephone calls in which we lie indicate that Dodd would transport methamphetamine to Williams, do not indicate that he would, or that his role extended beyond storing the 850 grams of methamphetamine at his house. My question to you, because I think this is a very close case, speaking for myself, why is this case more like U.S. v. Thomas and less like U.S. v. Rodriguez? Thomas' case, the government based its reasonable suspicion on a general tip from the FBI. The Ninth Circuit found the tip unlawful. In Rodriguez, there was extensive electronic wire intercept, as you know. Yes, Your Honor, I'd be happy to answer that question. In United States v. Thomas, the only issue, the only reasonable suspicion the government ended up having at the end of the day was Justice, I'm sorry, Judge Reinhardt's quote of whether the sound of marijuana was distinctive enough. The tip was treated as anonymous because, an anonymous tip by the court, because there's basically no information to corroborate any of the accuracy or any information about what that tip consisted of. And the other information that they had, the comings and goings of the cars, didn't mean anything either. There were completely innocent explanations for all of that. In contrast, so the only thing that was left was the officer's testimony in Thomas that when he heard the bag fall on the floor in the garage, he said that must have been marijuana as opposed to something else. And of course that was ridiculous and the court found so. In this case, there's extensive wiretap conversation that had been intercepted and a lot of information that's known particularly about the defendant's activities and his co-defendant's activities as it relates to engaging methamphetamine. Specifically, prior to this traffic stop, law enforcement knew from the wiretaps that Robert Williams was a, was involved in methamphetamine manufacturing and methamphetamine distribution. Because of the wiretaps, the government also knew that the defendant, defendant Dodd, was involved in the distribution of methamphetamine and that he worked for Mr. Williams. Not this lawyer. No, I'm sorry. I was pointing to his invisible client there. In any event, they also knew that Dodd had some activity perhaps at American Performance, the location where he was heading on the day of the stop. And then there are the events that happened right before the stop, which it may not be the most, may not have been the most reasonable interpretation, but it certainly was a reasonable interpretation of what was going on. In fact, I would submit it was the most reasonable interpretation of what was going on and it turned out to be absolutely true. That there was an explosion in a methamphetamine lab on April 14th of 2001. That's three days before the stop. The day before the stop, there's this conversation between Defendant Williams, who owns the shop where the defendant is pulled over and heading towards, and Defendant Green, where Williams tells Defendant Green, we're going to have some more tomorrow, essentially, and I will read the direct quote from it because I don't believe it was misinterpreted by law enforcement. Williams, after talking about, Green talks about how they were able to recover 850 grams of methamphetamine from the methamphetamine explosion, so they saved some of it. Williams then says, no, that's not bad, not bad, but we'll have the rest. We'll have some more ready for him to go tomorrow. And Green says, good deal. So they're talking about how Williams said, I'm going to get some more methamphetamine tomorrow. We're going to have some more ready to go. And right after those conversations are conversations that are intercepted between Defendant Dodd and his girlfriend, which law enforcement has interpreted as he's making some more methamphetamine. Do you agree or disagree with defense counsel, appellant's counsel, that this case rises or falls on the stop? In other words, in your view, are you conceding that there is not enough for a warrant for the house without what was discovered during the stop? Yes, sir. You are conceding. The warrant was based primarily on the stop, and that was the probable cause to go back to the house. As it turns out, they had it. There was much other PC, but it was not in the warrant. It was not in the affidavit at the time. But the stop was good for the reasons that I talked about. They knew, in general, in the big picture scope of things. Aren't you over-reading Hensley and Sutton? What I read those cases to say is that if the arresting officer understands that somebody else in the department has enough evidence to establish probable cause, then he doesn't have to have it all explained to him. It's not like you have to every beat cop. Sometimes you may send somebody out on a call in an emergency, and you don't have time to explain it to them. But so long as they are secure in knowing that somebody has established probable cause, that's enough. That can be imputed to the arresting officer. That's what I read Hensley to say, and that's what Sutton says, too. And if that's the case, then your case falls apart, doesn't it? Well, in this case, Your Honor. Is that a fair reading of Hensley? Your Honor, I don't believe that it is and that there are other cases. You have it there? Let's read it together. Which case are you talking about? I'm not talking about United States v. Kennedy School. Okay. Yeah, I don't believe I have the case. I have the quote that – I have the quote, and I have read the case. I'm familiar with the case. You came to court with that? I have a bunch of cases and the summaries of the cases, Your Honor. Is that what you're telling me? Yes. You came to court without the key cases? Your Honor, I have summaries of all the cases. I read the cases nonstop, and I'm familiar with the facts. What you're telling me is you came to court without the cases. Yes, Your Honor. Okay. Well, can you tell me what it says on page 233, then? Your Honor, I'm aware of what the holding of the court was. And there are additional cases. Yes. This is 469 U.S. 233. Assuming the police make a steady stop in objective reliance on a fly or bulletin, the hold of the evidence uncovered in the court of the stop is admissible if the police who issued the fly or bulletin possess reasonable suspicion justifying the stop. And then we conclude that if a fly – this is on page 232 – we conclude that if a fly or bulletin has been issued on the basis of an afficable fact supporting a reasonable suspicion that a wanted person has committed an offense, then reliance on that fly or bulletin justifies the stop to check identification. Doesn't that suggest that somebody – I mean, that the officer making the stop has to do so in reliance upon somebody else in the department having made a determination of criminal cause? Isn't that what the case stands for? Your Honor, I would disagree with that. I believe that, at least in the cases that have followed Sutton, that there is this general collective knowledge that can be imputed to somebody told to make a stop. For instance, this is a Fifth Circuit case, the United States v. Ibarra-Sanchez, which the government has cited in its brief. This is a case where a police officer was told to make a stop and not told anything about the investigation other than there was the existence of this drug trafficking organization. And that stop was held valid under the collective knowledge doctrine. The United States v. Rodriguez, which is a Seventh Circuit case, is another case in which the police officer was told to make a stop and told nothing other than the fact that there was this general drug investigation. The United States v. Terry Crespo, that is a case decided by this Court in January, recognized the existence of the collective knowledge doctrine, although it was dictated it did not have to rely on this case. So, and also the fact in this particular case is the officer, Officer Creighton, was told about the existence of a drug trafficking investigation. He was not told the specifics. You're also nice there because he was told we don't have enough to stop him. You go ahead and develop some probable cause by trying to find a trafficker to stop him. He was told exactly the opposite. If he was told, if he was communicating anything at all, we wish we could stop him, but we don't. So go find Tim Spiegel. And he did. That's exactly what he tried to do. He pretended that he found that there was a bad brake light, but he got caught. He got caught lots about it. Well, Your Honor, they would, the agents were definitely interested in having the officer try and develop independent probable cause to pull him over for several reasons. First of all, to preserve the integrity of the wiretap, which would have been compromised had they had to rely upon the wiretap conversations alone to pull over the defendant. And also they wanted a The defendant doesn't know what they're relying on. You know, if they have probable cause to pull him over, they say, pull over, buddy, get out of the car, put your hands on your head, and put handcuffs on him. And then at some later point, they tell him what it's about. They don't have to explain to him right on the spot where they got the information. That's not really plausible. But is there any indication that the officers had probable cause, had developed probable cause at the time that they sent, that they said go ahead and stop Don? The DEA agents investigating the case, Your Honor, yes. And this is the information that I'm talking about. But in general Well, this is the stuff that we're now sort of looking at and looking back and saying, oh, well, maybe there was probable cause or not. Well, the reason why they had the defendant stopped, of course, is because they believed that he was carrying contraband at the time. They didn't. Unlike the cases cited by the defense, the alien smuggling cases and Of course, but if the police could stop anybody that believed this was committing a crime, we wouldn't need a Fourth Amendment, would we? This is why we have probable cause. So the question is not, did they in their heart believe it? The question is, did they communicate to the arresting officer that they had probable cause, go ahead and arrest the guy? I believe the question is whether the collective knowledge of law enforcement at the time created reasonable suspicion for the stop. And not probable cause, but reasonable suspicion. This is a Terry stop where there's less than preponderance of the evidence, less than probable cause and more than a hunch. And here the government not only knew as a result of the wiretaps that the defendant was engaged in the distribution of methamphetamine with his co-defendant Williams where he was heading that day, but they also knew based upon the circumstances that occurred between the 14th and the morning of the stop that they believed the defendant had manufactured methamphetamine on the night prior to him being stopped and Williams was expecting some methamphetamine that morning. And that's far in excess of what's in United States v. Rodriguez. Not the Ninth Circuit case, but the Seventh Circuit case cited by the government where the only thing the government knew as a result of the wiretap was that the defendant who was meeting with the target, that a person was meeting with somebody who were targets of this wiretap investigation, they just wanted to identify him and they pulled him over. They didn't know specifically what was going on. They just knew he was meeting with drug associates and they pulled him over to identify him and the Seventh Circuit said that investigatory stop was valid because of the information from the wiretap. And that's another case, Your Honor, where the information concerning the probable cause and the validity of the probable cause was not communicated to the officer. I'm not aware of a case that has followed Sutton where that kind of specific information had to be passed on. It would seem to a certain extent less than the collective knowledge doctrine that the courts have adopted. In Rodriguez, let me just ask. It seemed to me that the visual surveillance confirmed what the wiretaps had informed the officers of. What was there here that confirmed the information from the wiretaps? Yes, Your Honor. What confirmed the information? Well, the fact that they saw the defendant going to the house where he was, they were going to, there was going to be the manufacturing activity on the night of the 16th and they followed the defendant from there to Williams' place, where they believe he's going to deliver methamphetamine to Williams based upon Williams' discussion with Green that he is expecting we are going to get some more that day. And it's interesting, the counsel dwells on that as a mistake of law. That's clearly not a mistake of law. In the mistake of law cases, which I do have with me, United States v. Lopez Soto, which we've cited in our brief, that's a case where there was a mistake of law by the officer who made the stop, the CFP officer. I believe in that case that's where he thought that a certain state required a front license plate and did not in fact require a front license plate, and that was a justification for pulling over the defendant. That's a mistake of law. This is not, at best, this is a mistake of fact, a misinterpretation of the call. I would submit it's not a misinterpretation. In fact, it's the most reasonable interpretation, and it's exactly what happened in this case. The defendant had the methamphetamine on him because the officers correctly interpreted what was going on in these phone calls, namely that Dodd was a part of the organization. Maybe they just got lucky, and the eight other cases where they got it wrong, we didn't get because they didn't find anything. I mean, if you go fishing often enough, you're going to catch something, and then when you catch something, you say, ah, look, the officers knew what they were doing. They caught somebody. What do we know about their error rate? What do we know about all the other people they stopped that day? Well, there's nothing in the record to indicate. This kind of reasoning, there's nothing in the record to indicate either way. What you are arguing on behalf of the United States is we have to assume their interpretation was reasonable because, look, it turned out to be right. I mean, a broken clock, at least a broken clock is right twice a day. Correct. Your Honor, I believe, though, you can disregard it. Judge Feist disregarded the fact that methamphetamine turns out. You've got to put that on your mind. Why are you making arguments like that on behalf of the United States? I mean, you know, you're saying, oh, well, it turned out right. I mean, you know, who are you? Your Honor. You can't possibly believe those arguments to be correct. Well, the correct argument, Your Honor, is that you look at the. . . Either there was probable cause and that it doesn't matter whether they find anything or not or they find the wrong thing or they're wrong. There's probable cause, whatever the standard is. It doesn't matter whether what you turn up turns out to be what you look for, right? That is correct, Your Honor. Okay. So that's just a make-quit argument. The argument, Your Honor, is. . . Designed to sort of deflect from the issue, isn't it? Well, the issue is whether there was reasonable suspicion based upon the factors that led to it. Right. And when they found something or didn't find something matters not a bit. Correct. So in arguing that it did, you were just sort of. . . Well, it's what happened, of course, Your Honor. What do you call it, puffing? It's correct, Your Honor, that the end result doesn't matter. But what does matter is the factors that led up to the decision to stop. And again, those factors were that Dodd. . . They knew Dodd was a drug trafficker who worked for Williams, which is the location where he's heading. And they interpreted these phone calls. . . Correct me or not. I think we understand your argument. You are several and a half minutes out of time. Thank you. I appreciate that. We'll give you your negative one minute. Thank you. Just a little positive. A little deeper into the hole here. The transcript to zero in really on what the issue is. Page 260 of the excerpts. And two-thirds of the way down the page, the quotation that Mr. . . . I'm sorry. Where is it? 260 of the excerpts. Right. This is the key call we're talking about. Two-thirds of the way down the page is the statement by Williams that we're focusing on here. These are the first names. Which one is Williams? Bob. Excuse me. Bob Williams. Okay. Which is the statement? No, that's not that. We'll have the rest. We'll have some more ready for him to go tomorrow. So who's the he? The government is saying the he is Dodd. But just you read the page, they're talking about the he is the cook that suffered the explosion. The cook, the he right above it is talking about he came up with the 850 and he started with 12. And then without a break, we'll have more for him tomorrow. More precursor chemicals to replace the ones that he lost in the explosion. So that lead to Dodd, that's not the he that they're talking about. So that's my argument that it's a plain misreading of the text that extrapolated all the rest from it. And on the issue of whether or not it's a mistake of fact or law. Why can't that refer to Dodd? Why can't that refer to F.A. Because immediately adjacent to that, the he they're talking about is the he who salvaged 850 from the 1200. They're talking about the cook. We'll have more ready for him to go tomorrow. Williams was the guy. Bob was the guy that had the source of the precursor chemicals. Green was the guy that had the connection to the cook. The cook suffered the explosion. And what this plainly states is tomorrow, OK, we got the 850. We need some more. So tomorrow I'll give you give Mr. Cook some more precursor chemicals. So the he is the cook. OK. And the. Thank you. Thank you. I will stand submitted to my paperwork right here is the next case to be argued in the United States versus one of Vargas. Negative. Yes, I think I got my Spanish isn't that good. But I think that's right.  Yeah. And. And. 会议会议会会议会会 会议会会会期
judges: D.W. Nelson, Kozinski, Graber